Case number 22-3023 from Nebraska, United States v. Cornell Williams. Okay, counsel, before you begin, I think this is one of the cases that was originally scheduled for Friday and you were kind enough to accommodate the court in rescheduling for today, and I want you to know that that is very much appreciated. Mr. McWilliams. Yes, Your Honor, may it please the court. I'm Rich McWilliams. I represent the appellate in this case. I work for the Public Defender's Office. On behalf of Cornell Williams, I appreciate the court's time. The warrantless entry of the Omaha Police Department into Cornell Williams' apartment lacked accident circumstances. Not only did the police not have a reasonable basis to believe that lives were threatened or that there was an imminent threat of injury or that escape was imminent or that there was evidence about to be destroyed, they actually had affirmative evidence, affirmative knowledge that that was not the case. They had received affirmative information that nobody was hurt, that the shooting had stopped, that the shots were fired outside, no harm had come to anybody, and yet they now invoke the accident circumstances doctrine to enter Mr. Williams' apartment without a warrant. The true reasons for their entry were to make contact with Mr. Williams and to investigate a crime. Counsel, would you summarize the affirmative information that you just referenced that undermines the factors that would generally justify accident circumstances? Yes, Your Honor. Witnesses called 9-1-1. Their call to 9-1-1 told the 9-1-1 operator that a shot had been fired outside. And just to be clear, is the record clear one or two shots here? It is unclear. It is unclear. The original 9-1-1 call seems to suggest a couple of shots lost in translation between 9-1-1 and the dispatch and the police officers. It does, in some iterations of the story, get reduced down to one shot, but I would submit that it's unclear from the record. So the witnesses call 9-1-1 to say the shot or shots are fired outdoors, from the balcony, in the air, and the witness actually tells the 9-1-1 operator, quote, Thereafter, the police dispatcher called the witness back and confirmed that there were no further shots. The shots had stopped. And then lastly, when the police officers arrived, they spoke again to these witnesses, who told them the shot had come from the balcony and that they were scared. Also interesting is that there is, we do not know, we know that about 18 minutes passed from when the officers were assigned to when they actually entered Mr. Williams' apartment, but there's nothing in the record, nothing that the government introduced at Edmonds, to tell us the amount of time between the actual shot or shots and the 9-1-1 call. And as a result, we don't know the amount of time that passed between the shot and the officers being assigned, the amount of time that passed between the shot and the officers' arrival, and the amount of time between the shot and their entry into Mr. Williams' apartment. Before you move on, I want to talk about just the pat-down, the pat-down search that happened initially when the officers went up to the door. Yes, sir. Why didn't reasonable suspicion suffice there in the sense that they had a report of the shot fired, that was from his apartment, from his balcony, and they could have believed that he had a gun on him? They didn't know what kind of gun, they didn't know if it was a rifle or a pistol or what. Right. Our quibble is not – I mean, we – the problem with the pat-down is that it occurred inside the threshold of his apartment, inside his home, and that they should have entered into the home in the first place. If they want to knock on the door and invite Mr. Williams out and then pat him down, I think we have a different story, but that's not what occurred here. Okay, so then we go on – no, I understand. And so then we go on to the next part. I want to make sure that was the distinction you weren't making. You're probably right about the home. Then why doesn't exigent circumstances allow at least a pat-down search? And I'll tell you sort of the thinking here, which is when you have shots fired, you don't know what kind of weapon it is. I don't think there's any court case in the country that say that officers have to stand across from somebody in the doorway, even of their own home, who could possibly be harmed and not be allowed to pat them down for weapons. Well, first of all, exigent circumstances is a doctrine that accepts them from the warrant requirement to enter into the home. Certainly, they probably could have patted Mr. Williams down, and that would be unobjectionable. But primarily, it wouldn't have yielded any evidence because there was no firearm found on Mr. Williams' person that was found later on underneath the cup. Now, wait a minute. You said the pat-down inside the threshold was okay under reasonable suspicion here? I mean, it could have been. Exigent circumstances is not an exception. It does not indicate the reasonable suspicion doctrine. Okay? Exigent circumstances is an exception to the warrant requirement. So, I mean, we're talking about apples and oranges. If the police wanted to pat down a foreman at Williams and hadn't found any evidence, we'd be talking about something totally different. But they didn't. There was nothing on Mr. Williams' person. So, help me out on the facts here. For the sake of argument, enter under reasonable suspicion, do a pat-down, have a conversation at that point. And what does your client say at that point? There's a request to do a walkthrough, right? We're not going to search, but we'd like to do essentially a sweep. What's his response to that? Well, at that point, my recollection from the government is that it is hands-up. It says you can do whatever you want or something to that effect. But, again, our argument is that once they've crossed the threshold in the apartment without warrant, which is a requirement under the Fourth Amendment, and without a recognized exception to the requirement, that is, exigent circumstances, what happens thereafter, whether you want to throw it under the banner of consent or probable cause or whatever, is a form of a poisonous entry into the apartment without exigent circumstances. Again, I don't think that reasonable suspicion enters into this conversation at all. Under the Fourth Amendment, you have a right to not have your home invaded without either a warrant or a recognized exception to the warrant requirement. Let me tell you how I think about the case, which is a little different from the district court.  So I think there were exigent circumstances for sure to pat him down, because I think that he could have had a gun, and that would at least allow them to enter the home. And then under Judge Kobus' questioning, I think at that point there was consent. He said you can do whatever you want. They go out, they find a shell case, and he said basically it leaves them in a game of hot and cold, like you play with your kids, to the gun in the cabinet. So I'm wondering if it's exigent circumstances for the pat-down, and of course nothing was found anyway for the pat-down, and then the rest of it is all just consent. I would respectfully disagree. I think that exigent circumstances pertains to searches of the person. You do have to have reasonable suspicion to detain someone. You have to have belief that they might be armed to pat them down. But exigent circumstances is not implicated in those inquiries. Exigent circumstances is only an exception to the warrantless entry into the home. And what I would submit to the court is that once the officers breach the threshold of Mr. Williams' home, behind the muzzle of a rifle, then they do not have a warrant or an exception to it, even if their intent is only to pat him down. You can't do that. You have to either invite the person. When you're doing a knock and talk, you're still governed by the Fourth Amendment. You can invite them out and pat them down, but you can't enter into their home. Well, let me challenge that. So suppose instead, I'm going to change the facts, still in his home, but your client pulls out a gun, an agent right at the officer's head. Under your theory, exigent circumstances would not allow them to take that guy down because he's on his top. Well, I mean, they could shoot him. I mean, it is their right to defend themselves under a self-defense theory of the law. But they couldn't go into the home. They couldn't breach the home, tackle him, and take him down. Well, of course they could because you have a right under the exigent circumstances doctrine, you can enter into a home if your lives are threatened or there's any harm to come to someone else. You can't just go into someone's home, though, based upon a dated report that wrongdoings occurred off of the individual's body. So it's not enough to have suspicion that he may have a gun on him. You'd actually have to see the gun in order to do the takedown. Well, the district court would agree with the former. I agree with the latter. At a minimum, I think that there are basically three categories of cases. And I think that the first is where you have affirmative injury, where the police officers have affirmative evidence of someone could be hurt. There's imminent danger here. And then there's the middle group where I think that it's just neutral, where there's a lack of information. We don't know. We have some concerns. We have suppositions. We have hunches, et cetera. But then there's the third category, which is the category that I think this case falls into, where the police officers have received information that there was an event, it has stopped, nobody got hurt, and everything is stable. What category does Valencia go into? Excellent question. I would put Valencia in the middle category where they're acting on a hunch. I think that this court, I mean, I think the majority of Valencia might put it in the first category where there was affirmative evidence of an injury or a threat. Either way, I think there are points of excellent distinguishing point between Valencia and this case, which is in Valencia the officers arrive and there are questions which abound. There are unaccounted for shells. There's not a lot of information forthcoming. They have to satisfy their own concerns. I don't think that's enough, but the court in Valencia did, and that's the universe we're operating in. But what differentiates Valencia from the present case is that when the officers arrive, it's not a matter of we don't know where those shells went to, we don't know if someone got hit. It's the eyewitnesses telling the police for the third time since the call came in, an event occurred, it has now stopped, nobody was hurt,  and the police, who are doing a lot of walking, a lot of chatting, say, okay, let's go make contact with this guy, and they go knock on the door, and before anything else that Judge Cross is talking about happens, they enter the apartment behind the muzzle of a rifle, and to do that, they either have to have extra circumstances, that is an ongoing injury, threat or emergency of some sort, or a warrant, and nothing barred them from going to get a warrant to search Mr. Williams' apartment. Well, counsel, you mentioned the witnesses who said it was a single shot, or maybe there were more than one. Apparently there's a little dispute about exactly the number of shots, and the officers see that no one is hurt outside, but why wasn't it objectively reasonable for officers to be concerned about occupants of the apartment? There was no evidence that there were other occupants of the apartment. Well, how would a reasonable officer know that? All he knows is there's a gunshot in the apartment. Is the officer supposed to just ignore that without investigating to make sure that no one has been injured or is being threatened? Maybe someone is at gunpoint inside the apartment. That's another difference between this case and Valencia's. In Valencia, there was, in this case, there's no report of any firearm or any shots being left inside the apartment. The witnesses are saying he came out of the balcony, he projected the gun outwards or in the air. There's no reports of shots being shot inside the apartment. So if the police officers are aware of people being injured in the apartment, that's just that, it's a concern. It's not based upon any evidence. If the witnesses are telling, and I say this in my rebuttal time, but if the witnesses are telling them, hey, there was a shot fired that was fired outside the apartment, and we know where the bullets went to, and we know that nobody got hit, I don't think that a reasonable officer would simply then say, well, we have some concern that there might be someone injured inside the apartment, when they don't have any information that there's anyone in the apartment, and they certainly have affirmative, contradictory evidence that there was no shots inside the apartment. And with that, I reserve the remainder of my time for rebuttal. Ms. Sorrello. May it please the court, counsel, my name is Kelly Sorrello, I'm an assistant United States attorney here on behalf of the affidavit of the United States. Law enforcement's entry into Cornel Williams' apartment on September 4th of 2020 was reasonable, and it was justified by exigent circumstances  both of responding law enforcement and the safety of others. Their actions were reasonably limited to expel the danger. The facts of this case include, as you've heard, reports from a neighboring resident that someone was firing a gun from their apartment balcony. Law enforcement was immediately dispatched, I know there's been discussions about the timing of the gunshots, and while there was never, as far as I'm aware, a statement about precisely how long it had occurred, all the statements suggested that it had immediately occurred when they interviewed witnesses on scene, there were discussions, or there were notes in the record about a child still being visibly frightened, all of the suggestions were that this had just occurred. So, roughly 20 minutes between when the 911 call comes in and law enforcement actually locates and enters the apartment. Law enforcement was aware that at least one witness, and this was recorded on Governance Exhibit 5, we get to Officer Arena's body cam, that one witness reported that there was a party in Apartment 32 with loud music, and once the gun went off, the music stopped. So, when this court looks at both what the officers knew, which was that an armed person had been firing a weapon in a residential area that had just occurred, and that he was, by all accounts, still there with the gun, as well as what they didn't know, including any sort of indication of what the motive was, the firearm's location, whether it was still on the suspect's person, who might also be in the apartment, all of those facts that they knew and didn't know suggested a danger both to themselves and to others. The Eighth Circuit in this court has consistently found that exigent circumstances exist where an armed person presents a danger to law enforcement or others. In the United States v. Ball, this court said that the presence of an armed suspect inside the house presented a threat to the lives of the officers outside. In that case, that was the case involving the drug deals on the porch. The weapon hadn't been fired. Of course, we don't know whether he was armed or not, right? Well, we know that he was at some point because he was actually specifically named by the witnesses as he meets the description of the suspects as described, and they indicated that he had a gun and he was firing it. So we know that he was armed in the sense of he had a gun with him in the apartment. And then the question is, is it on his person? Is it somewhere else in the apartment? Or is there somebody else in the apartment? So I just wanted to ask that question because I think they could suspect that he was armed, for sure. No question about that. And it may even create extra circumstances. But I know that the government argued below that consent was an alternative route. Does the government still contend that consent for the rest of the search beyond the pat-down would be a justification for it? Your Honor, yes. I think in reading the record, as this court has indicated, there's obviously this initial encounter at the door, and there are multiple officers. But then, as noted, they're asking questions about who else is there, is it okay to look around, and he says, yes, yes, ma'am, you can do whatever you want. There's some discussion later about whether he kind of revokes that all-in consent because he says he doesn't want you to search, but then he gives it again and ultimately consents to a search of the apartment. And I think that that all goes to the reasonableness of what the law enforcement is trying to do. It wasn't come in and then just immediately tear the place apart. They're making contact at the door, and then they're trying to determine. Because, of course, his statement, just like the suspects who were encountered in Valencia, is I have no idea what happened. I wasn't firing a gun. I wasn't out there. So they have these continued unknowns of whether he's lying to them or whether there's somebody else involved. So their statements or their actions were limited to dispelling that danger. Well, and I want to ask you about the protective suite, too, because here's where I think we go a little awry in applying that doctrine. I think a protective suite allows you to look for people who could have guns, right? Guns don't fire by themselves. And so when you start looking through kitchen cabinets, I don't think a protective suite allows you to look through kitchen cabinets, which is why the consent part of it becomes so important. You could open closet doors, but you can't start rummaging through somebody's floors or cabinets, I don't think. I would agree as far as a protective suite. I think they were looking for persons, victims, or potential suspects. I think in this case, the government's position would be that exigent circumstances would also support the case law supporting locating the firearm. I acknowledge that that's a little bit different from locating the firearm on a suspect, but there are several cases talking about the need to locate that firearm to eliminate that danger as they investigate, because we're dealing with someone who has fired the weapon, and law enforcement obviously has a need to protect themselves from that. But that does create an issue, though, because if you start talking about drawers and stuff, you can go through, I mean, there is a Fourth Amendment interest in that in the sense that you can look through their underwear drawer, you can look through their private papers, I mean, in terms of trying to locate the gun. And you're in the home on top of it. And there may be cases that suggest what you're saying, but it sort of makes the hair on the back of my neck stand up a little bit when you start talking about being able to do that. Understandable. And I think in this case, the facts and what's recorded is essentially that as soon as the Cornell Williams suspects that they're starting to search, he says, don't do that, and they stop and discuss with him about getting a warrant and that type of thing. So they're both kind of keeping him away from it. But I think that that was kind of under the understanding that he was okay with them searching, and then when he wasn't, they stopped searching until he consented again. So like in Valencia, in the appellant's reply brief, he distinguishes Valencia by saying, gunshots of an unknown result. And that's precisely what we have here. We didn't know the motive or the result of the gunshots. Also would note that Valencia was roughly 33 minutes after dispatch for the firing of the gun. And both occupants of the apartment had actually been interviewed by law enforcement and indicated that no one else was inside. Here, law enforcement knew that the shooter most likely remained inside, that the gun most likely remained inside with him. It was entirely unclear if anyone else was inside. I would suggest that that witness statement on Government's Exhibit 5 implies that there likely was someone else inside, that there was a party occurring and then the music stopped. So based on all of those things, a reasonable officer could and did in this case believe that the person who answered the door was armed and posed a danger to them and to anyone else inside. And that anyone of another person inside may need assistance. Because in this case, law enforcement's actions were reasonable and justified, I ask this court to affirm the order of the district court. And if there are no further questions, I will concede the rest of my time. Thank you very much. Thank you. Thank you. I first want to start off by saying that what I think is really the issue before the court is the entry into the apartment. And it's the contention that everything that happens after the entry into the apartment is a fruit of the unlawful entry. That, in my mind, cuts out any kind of consent analysis, any kind of pat-down analysis, protective sweep analysis. The argument, and again, we have truncated our arguments that we made at the district court down to a single argument before this court, which I think is the cleanest argument, which is whether or not the officers had an emergency that permitted them to enter Mr. Williams' apartment, his home, without a warrant. And that is the lone issue that we are raising before this court. What happens inside the apartment is a fruit of the poisonous entry, and I will submit to the court, not relevant. What the government is asking the court to do, and again, police officers are free to arrive on scene, and they're free to be concerned about guns, and they're free to be mindful of guns. They're free to even be curious about what's going on in someone's apartment. What they are not free to do is to enter someone's home without a warrant, based upon their own suppositions, hunches, and curiosities. And in this case, it takes it one step even further, which says, we're asking, the government's asking the court to allow officers then to disregard affirmative information that they have for the contrary, that negates their suppositions, that negates their concerns, and that negates their hunches. So it's simply because they want to enter the apartment. Here, they are told that a historical event happened. It has stopped. That nobody was hurt. That there was no gunshots inside the apartment. And it happened, and the shooting had stopped. They arrive, they have conversations, they joke with some of the residents, they go walk out the door, they say, let's make contact. And then, and this is the critical event in this case, they enter into this home without a warrant, based upon, and they later seek to justify that warrantless entry upon the idea that there was an ongoing emergency, even though every piece of information they received said to the contrary. So I'll ask the court to vacate this, the district court's order, and remain it back to the district court for an opinion consistently. Thank you. Thank you, counsel. Appreciate your arguments this morning, and the cases submitted. We will have a decision in this case as soon as possible.